UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA J. MAHER, | ) | CASE NO. 1:14CV2777 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| PRUDENTIAL INSURANCE | ) | |
| COMPANY OF AMERICA, et al., | ) | |
| Defendants. | ) | |

**CHRISTOPHER A. BOYKO, J.**:

This matter comes before the Court upon Cross-Motions (ECF DKT #21 & #22) for

Judgment on the Administrative Record.  For the following reasons, Plaintiff's Motion (ECF

DKT #21) is denied, Defendants' Motion (ECF DKT #22) is granted and judgment is entered

in favor of Defendants.

## I. FACTUAL BACKGROUND

Plaintiff, Melissa J. Maher, filed this ERISA action against Defendants, The

Prudential Insurance Company of America ("Prudential") and PruValue Insurance Benefits

Trust ("PruValue") (collectively "Defendants").  Plaintiff is a forty-six year old woman.  She

was employed at Bonne Bell, LLC. ("Bonne Bell") as Manager of Research and

Development.  (PRU 1079).[1]  Plaintiff notes that the job is of light physical demand while Defendants characterize the duties of the job as being consistent with sedentary demand giving the employee the opportunity to change positions at will.  (PRU 1080).  Other physical demands include exertion of ten pounds of force occasionally and exertions of a negligible amount of force more regularly.  *Id.*

> **A.**      **The Long-Term Disability Plan**

As an employee benefit, Bonne Bell provides a long-term disability ("LTD") plan (the "Plan") through Prudential to its employees.

The Plan provides:

You are disabled when Prudential determines that:

- you are unable to perform the ***material and substantial duties*** of your ***regular occupation*** due to ***sickness or injury***; and
- you are under the ***regular care*** of a ***doctor***; and
- you have a 20% or more loss in your ***monthly earnings*** due to that sickness or injury

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury:

- you are unable to perform the duties of any ***gainful occupation*** for which you are reasonably fitted by education, training or experience; and
- you are under the regular care of a doctor.

(PRU 0037) (emphasis in original).  The Plan further states:

_____

[1]     Documents with "PRU" are in the administrative record, which comprises plan documents, internal records, medical records and all materials considered by Prudential in connection with the claim at issue.  Plan documents are labeled 077212-000740-000001 through 077212-000740-000072 and are located at Dkt. No. 22.  All other documents contained within the administrative record can be found at Dkt. No. 17 and are labeled 077212-00740-000073 through 077212-000740-001136.

***Material and substantial duties*** means duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified, except that if you are required to work on average in excess of 40 hours per week, Prudential will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week.

***Regular occupation*** means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

(PRU 0037) (emphasis in original).

Prudential has also reserved the right in the Plan to make the final decision with regard to any eligibility for benefits. The Plan states:

*Prudential will assess your ability to work* and the extent to which you are able to work by considering the facts and opinions from:

- your doctors; and
- doctors, other medical practitioners or vocational experts of *our choice*.

*When we may require* you to be examined by doctors, other medical practitioners or vocational experts of *our choice*, Prudential will pay for these examinations. *We can require examinations as often as it is reasonable to do so.* We may also require you to be interviewed by an authorized Prudential Representative. Refusal to be examined or interviewed may result in denial or termination of your claim.

(PRU 0037) (emphasis added).

There is additional language throughout the Plan where Defendants have reserved the right to make the final decision for eligibility on all claims. Any participant must continue to send proof of continuing disability satisfactory to Prudential in order to continue to receive benefits under the Plan (PRU 046, 056-57). Prudential reserves the right to discontinue payments if the appropriate documentation is not submitted (PRU 057).

Prudential is also the Claims Administrator of the Plan. The Prudential Insurance

-3-

Company of America as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings and to determine eligibility for benefits.  The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious. (PRU 067).  Lastly, the Plan also lays out the claim process and the determination of benefits. On a first appeal, "Prudential shall make a  determination...within 45 days of the receipt of [the] appeal request." (PRU 068).  Additionally, "Prudential shall make a determination on [the] second claim appeal within 45 days of the receipt of the receipt of [the] appeal request." (PRU 069).

### B.    Plaintiff's Medical History

On September 6, 2001, Plaintiff saw Dr. John Gerace for a follow-up after a previous diagnosis for fibromyalgia and she was also diagnosed with Chronic Fatigue Syndrome. (PRU 565).  Throughout the next few years, she saw doctors for symptoms both related and unrelated to her previously diagnosed conditions. (PRU 561).  On December 8, 2004, Plaintiff visited Dr. Gerace once again and was referred to rheumatology. (PRU 561).  Dr. Gerace noted during that exam that Plaintiff previously had various symptoms, but was otherwise healthy.  (PRU 561).  While Plaintiff continued to see Dr. Gerace, much of her subsequent treatment was handled by her rheumatologist, Dr. Donna J. Sexton-Cicero, and her pain management specialist, Dr. Ellen Rosenquist. (PRU 114-96; 349-426).

On August 28, 2006, Plaintiff visited Dr. Sexton-Cicero for her first consultation. (PRU 114).  Dr. Sexton-Cicero noted that Plaintiff was previously diagnosed with fibromyalgia and antiphospholipid syndrome; but stated that it is unlikely, in her opinion, that Plaintiff has antiphospholipid syndrome as she has not had any episodes and Plaintiff's soft

tissue tender points could be suggestive of fibromyalgia. (PRU 015).  Dr. Sexton-Cicero recommended a follow-up in three months, stating that it often takes examinations over a period of time to make certain diagnoses. (PRU 116).

On February 2, 2007, Plaintiff returned to Dr. Sexton-Cicero with foot pain.  (PRU 118).  Dr. Sexton-Cicero stated it was her belief Plaintiff was experiencing Raynaud's in her feet. (PRU 118).  On April 14, 2007, Plaintiff visited Dr. Sexton-Cicero citing low-grade fevers and lesions on her feet. (PRU 120).  All of the past tests done on Plaintiff returned either negative or normal. (PRU 120).  It was at this examination where Dr. Sexton-Cicero first suggested to Plaintiff that she might be suffering from seronegative Sjogren's Syndrome with a small vessel vasculitis. (PRU 120).  Dr. Sexton-Cicero prescribed Plaquenil and suggested a follow-up in three months. (PRU 120).  During 2007, Plaintiff visited Dr. Sexton-Cicero multiple times, reporting decreased joint paint, fewer rashes and less frequent fevers which Dr. Sexton-Cicero attributed to the Plaquenil. (PRU 121-124).  Apparently, the combination of the Plaquenil and the reduction in symptoms over this period led Dr. Sexton-Cicero to diagnose Plaintiff with Sjogren's Syndrome.

Over the next couple years, Plaintiff visited Dr. Sexton-Cicero with regularity and expressed varying degrees of success with her medications. (PRU 124-134).  Plaintiff was placed on Neurontin to help cope with the pain from fibromyalgia. (PRU 122).  Starting in 2008, Plaintiff began a series of trigger point injections to deal with discomfort and pain. (PRU 127).  During Plaintiff's last visit in 2008, Dr. Sexton-Cicero noted that Sjogren's Syndrome is *probable*. (PRU 129) (emphasis added).  On January 23, 2009, Dr. Sexton-Cicero began referring to Plaintiff as having Sjogren's Syndrome. (PRU 130).  In June 2010,

Plaintiff had a neurostimulator implanted in her spine to deal with chronic pain.[2]

Plaintiff continued to visit Dr. Sexton-Cicero over the next few years with the diagnoses remaining similar while different medications were being used.  (PRU 130-196). On October 31, 2011, Plaintiff once again visited Dr. Sexton-Cicero complaining of chronic dry eyes and dry mouth. (PRU 151).  Plaintiff was diagnosed with small fiber peripheral neuropathy at this time. (PRU 151).  On March 8, 2012, Plaintiff explained to Dr. Sexton-Cicero that she suffers from chronic fatigue with widespread muscle pain. (PRU 157).  On December 17, 2012, Plaintiff complained of night sweats but denied otherwise having fevers or chills. (PRU 162).

Plaintiff began seeing Dr. Ellen Rosenquist, a pain management specialist, in 2012. Early visits with Dr. Rosenquist note trigger point injections for pain as well as a prescriptions for Vicodin and Zanaflex. (PRU 383).  These treatments continued throughout 2012 and Cymbalta was added to the medications prescribed to Plaintiff later in 2012. (PRU 353).  Plaintiff has continued to see Dr. Rosenquist regularly through the ERISA disability process. (PRU 349-426).

On March 26, 2012, Plaintiff ceased working for Bonne Bell due to her medical conditions.  On July 23, 2012, Plaintiff filed her claim for LTD benefits.

### C.    Denial of Plaintiff's coverage and appeals

---

[2]    The location of this information in the administrative record is unclear.  Plaintiff points to PRU 1042 as the source of this information, but the information is not located at that reference. (Pl. Br. p. 2 [ECF No. 21]).  However, the implantation of the neurostimulator is referenced in the reports of both Dr. Stubbs and Dr. Kramer. (PRU 430, 624).  As a result, the Court will treat this information as factual and part of the administrative record.

A letter was sent to Plaintiff outlining the policy, including but not limited to, the monthly amount to be paid under the policy and the requirements for continued eligibility. (PRU 1126). The letter notes that Prudential will assist Plaintiff in returning to work and outlines the ability to recover 100% of the policyholder's pre-disability earnings by returning to work within the required timeframe. (PRU 1125). The letter outlines services which are in place to assist with the successful return to work of the policyholder. (PRU 1125). Lastly, the letter states that the policyholder will be able to continue to receive benefits "if [she is] not able to perform any gainful occupation that [she has] the ability to perform based on [her] education, training, and experience." (PRU 1126).

The approval of benefits was based upon a review of the available medical information by Prudential's Maliea Brackett, RN. (PRU 1038-1041). Brackett noted that Plaintiff suffered from Sjogren's Syndrome, small cell vasculitis and fibromyalgia. (PRU 1040). Brackett stated that Plaintiff had been working with these conditions for the past six years, but the constant flare-ups and significant fatigue associated with the conditions have rendered her unable to return to work. (PRU 1040). Nurse Brackett suggested Plaintiff should be free from flare-ups for at least two months before attempting a return to work. (PRU 1040). Lastly, Nurse Brackett also noted that Plaintiff has significant peripheral neuropathy stemming from her small vessel disease and mentioned the implantation of the spinal cord stimulator in 2010. (PRU 1040). Based upon these findings, Prudential approved Plaintiff's LTD claim effective June 24, 2012. (PRU 1125).

As part of the standard review procedures, Defendants enlisted the services of Dr. Sara B. Kramer, board-certified in internal medicine and rheumatology, to review Plaintiff's

medical record. (PRU 630). Dr. Kramer's report was completed on August 1, 2013 and included medical records from 2011 to that time. (PRU 626-27, 630). Dr. Kramer reviewed the records of Dr. Sexton-Cicero dating back to early 2012. (PRU 624-26). With regard to the Sjogren's Syndrome, Dr. Kramer stated there was nothing in the documentation to establish when or why the diagnosis was made. (PRU 628). According to Dr. Kramer, the mucus membranes were moist despite Plaintiff's complaints of dry mouth and dry eyes. (PRU 628). Dr. Kramer noted that the small fiber peripheral neuropathy appeared to be responding well to a higher dose of medication. (PRU 628). Dr. Kramer acknowledged that there were small purpuric lesions on Plaintiff's legs, however, she did not believe there was evidence to support that the lesions were the cause of any pain or symptoms. (PRU 628).

Dr. Kramer also reviewed the capacity questionnaire completed by Dr. Sexton-Cicero and the Activities of Daily Living Questionnaire ("ADLQ") completed by Plaintiff. (PRU 626, 627). The capacity questionnaire suggested Plaintiff was able to stand/walk for two-three hours per day, one hour at a time, and sit for four hours per day, thirty minutes at a time; however, Dr. Kramer did not believe there was any information in the medical record to support this assessment. Rather, Dr. Kramer opined that Plaintiff was able to sit for six hours and stand for four hours per day. (PRU 628). Lastly, Dr. Kramer stated it was reasonable to believe Plaintiff was able to exert herself more than she listed on the ADLQ. (PRU 629).

On August 8, 2013, Defendants terminated Plaintiff's LTD benefits. In the letter, Prudential indicated that it had received medical records from Dr. Sexton-Cicero and the Cleveland Clinic (the employer of Dr. Rosenquist). (PRU 1110). Upon review, Prudential's Tamica Johnson determined that between the Plaintiff's regular job duties and the analysis of

-8-

the medical records by Dr. Kramer, the available medical evidence did not support a finding of significant physical restrictions rendering her incapable of performing her job duties. (PRU 1112).

### 1.    Plaintiff's First Appeal

Plaintiff appealed the termination of benefits on October 29, 2013.  In support of her appeal, Plaintiff submitted letters from Dr. Sexton-Cicero and Dr. Rosenquist.  Both letters summarized the symptoms and treatment given to Plaintiff during the time she had been seeing each physician. (PRU 598-600).  Both doctors concluded by stating that it was their recommendation that Plaintiff is unable to return to work given her current state and that her pain symptoms will be aggravated by the exertion required by her position with Bonne Bell. (PRU 598-600).

Defendants requested an independent file review of Plaintiff's claim.  On February 13, 2014, Dr. Jeremiah Stubbs, an occupational medical specialist, prepared a report.  (PRU 430-444).  Unlike Dr. Kramer, the review Dr. Stubbs undertook was a compilation of medical documents dating back to 2001. (PRU 442-444).  However, Dr. Stubbs concluded that the medical records did not support a diagnosis of Sjogren's Syndrome or show how the diagnosis of Sjogren's Syndrome was made. (PRU 438).  This finding was based on the fact that the anti-nuclear antibody ("ANA") was negative and none of the exams by the attending physicians showed debilitating dryness of the eyes or mouth which would be indicative of an autoimmune disease. (PRU 438).  Further, Dr. Stubbs was of the opinion that none of the office notes or the functional capacity evaluations addressed how Sjogren's Syndrome would have limited Plaintiff's ability to work. (PRU 438).  While Plaintiff also complained of

chronic pain, a bone scan from 2001 and a thoracic MRI were negative. (PRU 439).  Also, as recently as 2013, the reports from Dr. Sexton-Cicero indicated that Plaintiff had a normal gait and no joint swelling. (PRU 439).

Dr. Stubbs also noted the diagnoses of peripheral neuropathy and vasculitis.  (PRU 439).  However, multiple exams revealed normal neurology, no focal deficits and normal sensory function. (PRU 439).  Dr. Stubbs opined that Plaintiff does suffer from fibromyalgia, but noted that fibromyalgia is a manageable condition.  (PRU 439).  Dr. Stubbs noted that Plaintiff has been responding well to treatment for fibromyalgia and that diagnosis should not prohibit sedentary or light work.  Based upon these findings, Defendants concluded nothing in the record would prevent Plaintiff from performing her regular occupation and denied the first appeal on February 24, 2014. (PRU 1089-1095).

## 2.    Plaintiff's Second Appeal

On August 13, 2014, Plaintiff submitted a second appeal to Defendants.  In support, Plaintiff included a statement from Dr. Sexton-Cicero and a letter from her supervisor, Brian Williams. (PRU 209, 342).  The letter from Dr. Sexton-Cicero reaffirmed the Sjogren's Syndrome diagnosis and explained that while the ANA was negative, 30% of individuals afflicted with Sjogren's will be seronegative. (PRU 209).  Dr. Sexton-Cicero also noted while Plaintiff's electromyography was normal, it will be normal when small fiber peripheral neuropathy is present. (PRU 209).

Before deciding on the second appeal, Defendants requested that a third independent file review be performed by Dr. Julia Ash, a rheumatologist (PRU 103-113).  Dr. Ash had a comprehensive set of medical documents for Plaintiff dating back to 2001, including office

-10-

visit notes from Dr. John Gerace (family practice), Dr. Seamus Walsh (family practice), Dr. Sexton-Cicero and Dr. Rosenquist. (PRU 103-04).  Dr. Ash concluded that the medical documentation does not support a finding of Sjogren's Syndrome. (PRU 108).  Dr. Ash agrees with Dr. Sexton-Cicero that 20%[3] of primary Sjogren's Syndromes are seronegative, but notes that a diagnosis would require a minor salivary gland biopsy with biopsy pathology consistent with primary Sjogren's Syndrome. (PRU 108).  Without a biopsy, such a diagnosis of Sjogren's cannot be made according to Dr. Ash. (PRU 108).  Dr. Ash also notes that a diagnosis of leukocytoclastic vasculitis cannot be made without a biopsy of the lesions on the lower extremities. (PRU 109).  Dr. Ash also denies the diagnosis of peripheral small fiber neuropathy by stating the diagnosis was based on self-reported complaints and a definitive diagnosis would require a skin biopsy. (PRU 109).  Dr. Ash states that fibromyalgia is present, but there are several FDA-approved therapies to deal with the symptoms. (PRU 111-112).

Dr. Ash also opines on the restrictions and limitations due to the fibromyalgia.  Dr. Ash states that as of August 1, 2013, the Plaintiff should be limited to:

> sitting up to 8 hours per day with 5-minute breaks every 2 hours for stretching; frequent standing; frequent walking; occasional climbing stairs; occasional reaching above head due to self-reported complaints of neck and upper back pain; frequent reaching at and below desk level; frequent bending below waist; occasional crouching and kneeling; no crawling; occasional driving; occasional lifting and carrying up to 10 pounds; occasional pushing and pulling up to 100 pounds if weight is on wheels;

_____

[3]     Dr. Ash does not point to the exact document where Dr. Sexton-Cicero notes that 20% of Sjogren's syndrome cases are seronegative.  However, Dr. Sexton-Cicero does state in her letter of support (dated June 16, 2014 [PRU 209]) that seronegative Sjogren's Syndrome occurs in 30% of patients.  Notwithstanding, both doctors conclude that a portion of Sjogren's Syndrome sufferers are seronegative.

frequent handling, fingering, grasping and keyboarding, and no operation of heavy machinery.

(PRU 111).

Dr. Ash also states that it was her belief that Plaintiff's responses on the ADLQ are not supported by the medical documentation. (PRU 112).  Based upon this information, Defendants denied the second appeal on October 14, 2014.

This Complaint followed.

## II. LAW AND ANALYSIS

### Standard of Review

In cases regarding the denial of ERISA benefits, the Court must resolve the defendant's decision to deny benefits by using the *de novo* standard of review or the more deferential "arbitrary and capricious" standard.  The Supreme Court has held "that a denial of benefits...is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 115 (1989). The parties agree that the correct standard of review is the arbitrary and capricious standard. As a result, the Court will scrutinize Prudential's denial of benefits under the arbitrary and capricious standard.

Under this standard, plaintiff bears the burden of proving the denial by the plan administrator was arbitrary and capricious.  *Farhner v. United Transp. Union Discipline Income Prot. Prog.*, 645 F.3d 338, 343 (6th Cir. 2011).  The arbitrary and capricious standard is the least demanding form of judicial review.  *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000).  The Court must decide whether the plan administrator's decision to

deny benefits was rational according to the provisions of the plan.  *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003).  When a plan administrator chooses to rely on the opinion of one doctor over the other, the decision is not necessarily arbitrary and capricious because it would still be possible to offer an explanation for the administrator's decision. *Id.*  However, it is the duty of the Court to review "the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id*. at 172.  In doing so, the Court will determine whether the administrator made a "deliberate, principled, and reasoned decision." *Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 618 (6th Cir. 2006).

Plaintiff sets forth two main objections to the process by which Defendants denied LTD benefits under the Plan.  First, Plaintiff alleges a conflict of interest as the Defendant is both the provider of the LTD benefits and the administrator of the claim.  Second, Plaintiff sets forth several allegations that the medical review performed by Defendants lacked adequate quality and quantity.  Plaintiff alleges these deficiencies rendered the denial of LTD benefits arbitrary and capricious.  The Court will address both allegations in turn.

### A.      Conflict of Interest

Plaintiff suggests that there is a structural conflict of interest as Prudential is both the provider of benefits and the administrator of the claim.  Defendants respond by stating the Court should only consider a possible conflict of interest in certain situations.  Defendants also state that Plaintiff has not offered any evidence that the structural conflict played a role in the ultimate decision to deny benefits.

The fact that a party has the dual role of insurer and administrator is a factor to be

-13-

considered when determining if the denial of benefits was an abuse of discretion. *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). However, the plaintiff must go beyond an allegation of a conflict by showing significant evidence that a conflict motivated the decision. *Pruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998)**.** A conflict of interest will prove more important where circumstances suggest a higher likelihood that it affected a benefit decision, but should prove less important where the administrator has taken steps to remove bias in favor of accuracy. *Glenn*, 554 U.S. at 117. As stated, Plaintiff has put forth no evidence that the administrator was motivated by its dual role. Additionally, all three reviewing physicians disclaimed any possible conflict of interest in their file reviews (PRU 103, 441, 629-30). *See Curry v. Eaton Corp.*, 400 F. App'x 51 (6th Cir. 2010). For these reasons, Plaintiff cannot prevail on a conflict of interest argument.

## B. Medical Record Reviews

Plaintiff argues that Defendants acted arbitrarily and capriciously in denying the LTD claim because of the lack of quality and quantity of the review of Plaintiff's medical records. More specifically, Plaintiff states Defendants acted arbitrarily and capriciously by only requesting medical information for a twelve-month period. Also, Plaintiff states that all three file reviews performed during the appeal process were not sufficiently performed, resulting in the denial of Plaintiff's LTD claim and subsequent appeals.

### 1. Defendant's Medical Record Retention

Plaintiff argues that despite the fact that Defendants were aware of her condition for many years, the fact that they only requested medical records for the previous twelve months was arbitrary and capricious. Plaintiff further argues that the limitation resulted in Prudential

-14-

discounting any diagnoses of the Plaintiff which occurred prior to the twelve-month period of review.  Defendants respond by stating nothing in the Plan required them to seek medical information beyond twelve months.  Neither party cites any case law which either requires a plan to go beyond the retention kept by Defendant or that sets a standard of twelve months as a sufficient amount of time for records retention.  As a result, the Court will look to see what is contained within the Plan documents.

The Plan states that a participant is disabled when Prudential determines, *inter alia*, that the participant is unable to perform the material and substantial duties of his or her occupation due to the illness. (PRU 037).  The Plan further states that Prudential will look to the facts and opinions from the doctors of participants as well as "doctors, other medical practitioners or vocational experts of [Prudential's] choice." (PRU 037).  Additionally, upon appeal, a full review of the information in the claim file will be reviewed with no deference given to the initial benefit determination.[4] (PRU 068).  Based upon this language and the language in the remainder of the Plan, the Court must determine if the Administrator arbitrarily and capriciously deviated from these terms.

Plaintiff states that the process was arbitrary and capricious because it resulted in "records reviews concluding that [Plaintiff] doesn't have the diagnoses for which she has been poked, prodded, cut, drugged and debilitated due to for the past decade plus." (ECF DKT #21, p.12).  However, there was information from Drs. Sexton-Cicero, Rosenquist,

---

[4]     This wording is taken from the Summary Plan Description as opposed to the Plan Document.  There is no ERISA requirement that the terms of a policy must be contained within a single document.  *Rinard v. Eastern Co.*, 978 F.2d 265, 268 n.2 (6th Cir. 1992).

-15-

Ekman and Gerace in the Prudential file. (ECF DKT #22, Ex. 1).  Specifically, notes from

visits with Dr. Sexton-Cicero dating back to June 1, 2012 were contained in the file.  The

notes from Dr. Sexton-Cicero were comprehensive.  Notes from each visit summarized the

history of the present illness, current problems, medical history, medications prescribed, a

summary of the physical examination, diagnoses and orders. (PRU 162-65).  Notes from Dr.

Rosenquist are equally as detailed. (PRU 370-83).  Both doctors detail their past experiences

with the Plaintiff, documenting her current diagnoses at the time of the treatment.  In light of

these reports, there is no evidence to show that the record review by Prudential in any way

masked the diagnoses of Plaintiff's physicians.  Rather, they signaled to the reviewer that

Plaintiff was diagnosed with certain conditions in the past.

Notwithstanding, Plaintiff contends that the short review period is flawed and amounts

to an arbitrary and capricious review.  This belief is erroneous for two reasons.  First, the

Plaintiff's last day of work was March 26, 2012.  This date is significant because that is when

Plaintiff needed to be disabled, as defined by the Plan, to receive benefits.  In order to

determine whether an individual is currently disabled, it is important to look to opinions of

medical professionals who have seen the patient around the time of the alleged disability.

The records retained by Defendants were comprised of time periods both before and after

Plaintiff's last day of work.  Second, a long range review of Plaintiff's medical records could

actually result in an arbitrary and capricious review.  For example, had Prudential sought

medical records for the past ten years, the records would have shown that Plaintiff worked

with her diagnosed conditions for almost ten years before filing her claim.  Armed with this

information, the Administrator could have more easily dismissed Plaintiff's claim for benefits

without a reasoned, deliberate review.  For these reasons, the Court finds that the scope of Prudential's record retention was not arbitrary and capricious.

### 2.    Independent File Reviews

At the outset, in support of her position that the independent file reviews were improper, Plaintiff states that not only was she never seen or examined by any of the physicians, but she was also never contacted by any of the file reviewers.  The Sixth Circuit has ruled that there is nothing inherently objectionable about a file review as long as it is performed by a qualified physician in the context of a benefits determination.  *Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 296 (6th Cir. 2005).  However, if the plan reserves the right to conduct the a physical examination, the decision to bypass a physical examination could raise questions about the thoroughness and accuracy of the denial of benefits, rendering the decision arbitrary and capricious. *Id.* at 295.

The terms of the Prudential Plan state that Prudential reserves the right to assess the participant's ability to work; and in doing so, Defendants are required to consider the facts and opinions of the participant's doctors as well as other doctors or medical practitioners of their choosing.  (PRU 037).  The Plan states that Defendants may opt for a participant to be examined by other doctors, medical practitioners, or other experts and may request that the participant be interviewed by a representative of Prudential, but this decision is left to Defendants in their sole discretion. (PRU 037).  Defendants explain that they made a reasoned decision not to conduct an independent medical evaluation because of the chronic nature of Plaintiff's symptoms, which may or may not have manifested themselves on the day of the evaluation.  Instead, Defendants chose to conduct three file reviews over the course of the

initial application and two appeals processes to get a better understanding of Plaintiff's symptoms.  The Court finds this reason convincing and, therefore, the decision to only conduct file reviews was not arbitrary and capricious.

The first independent file review was done by Dr. Sarah Kramer. (PRU 624-630). Plaintiff alleges that this review was arbitrary and capricious because the medical records reviewed by Dr. Kramer only dated back to 2011.  As a result, Dr. Kramer had no knowledge of the gingival grafts done in 2003 or lacrimal plugs placed by an ophthalmologist in 2008. However, Plaintiff does not cite to ERISA or any case law which guides the Court on how far back Defendant was required to go with the file review.  Additionally, the office notes from Dr. Sexton-Cicero and Dr. Rosenquist were quite comprehensive in that each subsequent visit summarized the diagnoses from past visits. (PRU 114-196, 349-426).  This would have allowed any medical reviewer the opportunity to have an understanding of any conditions which afflicted the Plaintiff over time.  Additionally, as previously stated, the Plan states that benefits will be paid when Prudential determines that the participant cannot perform the material and substantial duties of their regular occupation.  (PRU 037).  In order to determine whether an individual is currently disabled under this standard, it would be prudent to look at the most recent medical records.  Dr. Kramer was asked whether Plaintiff had any restrictions or limitations on June 1, 2013 moving forward.  (PRU 627).  Upon review of all of the medical documentation provided to her, including the ADLQ completed by Plaintiff, Dr. Kramer made a reasoned determination that Plaintiff could sit up for one hour at a time, up to six hours per day and stand/walk for an hour at a time for up to four hours per day. (PRU 628).  Prudential, as Plan Administrator, may not refuse to credit reliable evidence, including

-18-

that of a treating physician, but also must not give special consideration to the treating physician.  Moreover, courts may not impose on plan administrators the burden of explaining when they credit reliable evidence which conflicts with that of the treating physician.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).  For these reasons, Defendants' reliance upon the file review of Dr. Kramer was not arbitrary and capricious.

Plaintiff also contends that the file review by Dr. Jeremiah Stubbs following the first appeal was arbitrary and capricious.  Plaintiff states that Dr. Stubbs was an unqualified file reviewer as he is a board-certified physician in occupational medicine.[5]  Plaintiff specifically cites from the Code of Federal Regulations that the review needed to be performed by a health care professional who has training and experience in the field of medicine involved in the medical judgment.  29 C.F.R. § 2560.503-1(h)(3)(iii).  While Plaintiff cites this regulation, she offers no further explanation as to why an individual who is board-certified in occupational medicine would not qualify as having sufficient training and experience in the field of medicine to conduct the file review.  Defendants respond with the above because Plaintiff claimed to be unable to work because of her conditions, and an evaluation by an occupational health specialist was appropriate.  Previous cases where functional limitation at work was relevant to an LTD claim have not been overturned because the physician conducting the file review was certified in the field of occupational medicine.  *See McCollum v. Life Ins. Co. Of North America*, No. 10-11471, 2011 WL 3958458 (E.D. Mich. September 8, 2011), *rev'd on other grounds*, 495 F. App'x 694 (6th Cir. 2012); *Bishop v. Metropolitan*

---

[5]     It is worth noting that Dr. Kramer and Dr. Ash, the other two file reviewers, are both board certified in rheumatology.  As a result, Plaintiff takes no issue with their ability to conduct a file review.

*Life Ins. Co.*, 70 F. App'x 305 (6th Cir. 2003).  As a result, the Court holds that Defendants'
decision requiring a physician in occupational medicine to conduct a file review was not
arbitrary and capricious.

Plaintiff also asserts that Defendants' reliance on the review of Dr. Stubbs was
arbitrary and capricious because Dr. Stubbs denied the medical findings of Plaintiff's treating
physicians.  It is true that Dr. Stubbs disagreed with some of the evaluations, but he provides
a reasoned basis for reaching his conclusions. (PRU 430-444).  Dr. Stubbs states that there is
a diagnosis of Sjogren's Syndrome, but states there is no detail as to how the decision was
made. (PRU 440).  He states there were no reports of debilitating dryness of the eyes or
mouth, which would have been indicative of this condition. *Id.*  He states that while there
were complaints of lower back pain, there were no EMG/nerve conduction studies nor an
MRI which could have confirmed the symptoms.  *Id.*  Dr. Stubbs also notes that Plaintiff had
a normal gait with no joint swelling as of a March 2013 visit with Dr. Sexton-Cicero.  *Id.*
Although there were statements from the attending physicians of peripheral neuropathy, Dr.
Stubbs states there was a normal neurological exam with no focal deficits and normal sensory
function.  *Id.*  As a result, he opines that there was no medical evidence showing that the
peripheral neuropathy negatively impacted Plaintiff.  *Id.*  Dr. Stubbs recognizes that there was
a spinal cord stimulator placed in Plaintiff and that Plaintiff was receiving trigger point
injections, but according to the file, Plaintiff was responding well. (PRU 441).  Lastly, with
regard to the vasculitis, Dr. Stubbs notes that the purpuric skin lesions were not seen on all
examinations and there was no indication that the lesions were painful or tender to the touch.
*Id.*

-20-

Dr. Stubbs did not simply discard the findings of the treating physicians as suggested by Plaintiff.  Dr. Stubbs provided a sound and reasonable explanation for all of his findings. A plan administrator cannot simply ignore opinions of treating physicians, but can resolve conflicts between physicians by providing reasons for adopting opinions contrary to the treating physicians.  *Curry v. Eaton Corp.*, 400 F. App'x 51, 60 (6th Cir. 2010).  As a result, neither Dr. Stubbs' file review nor the decision to deny benefits relying upon Dr. Stubbs' review was arbitrary and capricious.

Lastly, Plaintiff contends that Dr. Ash's file review after the second appeal was also improper.  Dr. Ash had the benefit of reviewing a lengthy medical record, including office visit notes dating back to 2001.  (PRU 103).  Plaintiff's main disagreement with Dr. Ash's review is her conclusion that for a seronegative Sjogren's Syndrome diagnosis, Plaintiff would need to undergo a minor salivary gland biopsy.  (PRU 108).  Plaintiff insists that this procedure is not necessary, but cites to no factual evidence to support her position.  Plaintiff merely relies on the fact that neither Dr. Kramer nor Dr. Stubbs arrived at the same conclusion as Dr. Ash.

Dr. Ash, however, does support her findings.  Dr. Ash notes that the Sjogren's associated serologies are all negative and acknowledges that 20% of Sjogren's sufferers are seronegative.  (PRU 108).  However, she states that a definitive diagnosis would require a minor salivary gland biopsy with a focal lymphocytic sialadenitis focus score greater than four.  *Id.*  Without a positive serology to support Sjogren's Syndrome or a salivary gland biopsy, Dr. Ash concludes that the diagnosis is not supported by any conclusive evidence. (PRU 108-109).  Once again, the plan administrator does not bear the burden of explanation

when it credits reliable evidence conflicting with that of the treating physician. *Nord*, 538 U.S. at 834.

Plaintiff also takes issue with Dr. Ash's report because fever was not noted on the report. However, Dr. Ash actually noted that while "intermittent fevers are mentioned in the history, no fever is ever documented during follow-up visits with any of the treating providers." (PRU 110). Notwithstanding this distinction, Plaintiff does not provide a basis for why the fevers from 2007 and 2008 would have an impact on the ultimate decision in 2013. Further, Plaintiff acknowledges that the fever was under control once she was under the care of a pain management specialist who put her on a regimen of painkillers.

According to the information in her report, Dr. Ash concludes Plaintiff would be limited to sitting up to eight hours per day with five minute breaks every two hours for stretching. (PRU 111). Additionally, Plaintiff could frequently stand and walk and could occasionally lift 10 pounds and push or pull up to 100 pounds if the weight were on wheels. *Id.* These limitations would allow Plaintiff to meet the physical demands required of someone in her position at Bonne Bell. (PRU 1080). As a result, the decision of the Plan Administrator to rely on the report of Dr. Ash was not arbitrary and capricious.

### III. CONCLUSION

After a thorough review of the entire administrative record, the Court finds that Defendants' denial of LTD benefits is not arbitrary and capricious. Defendants relied upon the reasoned opinions of three different independent physicians before arriving at the decision to deny LTD benefits to Plaintiff.

For all the reasons set forth above, Plaintiff's Motion (ECF DKT #21) for Judgment

on the Administrative Record is denied, Defendants' Motion (ECF DKT #22) is granted and

judgment is entered in favor of Defendants.

     **IT IS SO ORDERED.**

                                    **s/ Christopher A. Boyko**
                                    **CHRISTOPHER A. BOYKO**
                                    **United States District Judge**

**Dated:  December 14, 2016**